WILLIAM B. DINSMORE, PRESIDENT OF ADAMS EXPRESS CO. *v.*
WILLIAM B. DUNCAN AND OTHERS.

A United States treasury note issued under the act of Congress of March 3d,
1865 (13 U. S. Statutes at Large, 468), in which the name of the payee had not
been filled in, was endorsed on the back by the owner, a national bank, as fol-
lows: "Pay to the Secretary of the Treasury for conversion. A. B., cashier."
It was given to a common carrier to be transported to the treasury. While on
the way, it was stolen from the common carrier, the endorsement on the back
erased by the thief, and the note sold to a purchaser in good faith and for full
value. *Held,* that the purchaser obtained a good title to the note.

Negotiable notes issued by the United States Government are subject to the
common law rules applicable to commercial paper. Where in such a note no
payee is named, it is payable to any *bona fide* holder, before maturity, who may
insert his own name, or that of any other person, as payee.

EXCEPTIONS to a direction of the court at trial term, direct-
ing a verdict for plaintiffs, heard at general term. The facts
are stated in the opinion.

*W. W. Macfarland,* for defendants.

I. The theory of plaintiffs' case is, that the note in ques-
tion, according to the law merchant, bore, at the time it was
stolen, a restrictive endorsement; that by one felony the note
was taken from the plaintiffs' possession, and that by another
felony or fraud the endorsement was removed; and that be-
cause of this restrictive endorsement, as they call it, the defend-
ants obtained no title to the note. If this theory were true, it
would not entitle the plaintiffs to recover, as will hereafter be
shown; but it is not true. The essential fact, constituting the
premise of the argument, has no existence. The note was
never endorsed, in any sense in which that term is applicable
to negotiable paper. The endorsement of negotiable paper im-
ports a transfer by some person who has a right to endorse.
There can be no endorsement, in this sense, except by the
payee of the bill, who may be the payee originally nominated

in the body of the instrument, or designated as such under an implied authority to fill a blank left for the purpose, or some person deriving title from such payee by regular and successive endorsements (2 Parsons on Bills, 1, 2 and 4; Smith's Mercantile Law, 215; 1 Am. Lead. Cases, 316, note 2; Chitty on Bills, pp. 140, 156; 14 Abbott's Pr. 278). The note in question was issued with implied authority to any *bona fide* holder to impose an obligation upon the Government in favor of himself, or any person nominated by him as the payee; but until the payee was thus nominated, the note contained a mere promise without a promisee, and in this condition was an imperfect instrument, imposing no obligation (1 Parsons on Bills, 33).

While the note remained in this imperfect condition it is obvious that no person could either restrict, or in any manner affect its negotiability by merely writing on the back of it a direction to the Secretary of the Treasury to do a certain thing with it. This writing by a person who sustained no legal relation to the note, performed no office whatever touching its negotiability. For such a purpose it was merely void. At most, the only effect it could have would be, perhaps, to give notice of a possible adverse equitable interest, had it remained upon the note. There was not, therefore, at any time any re-restrictive endorsement on the note in question, nor do the defendants claim title under or through any such endorsement. They claim to hold the note simply as *bona fide* purchasers thereof, and as the original and first payees ever nominated therein under the authority conferred by the maker. The bank did not at any time take the measure required by law to protect their title by a restrictive endorsement, and hence whatever legal effect might be due to that circumstance, had they done so, inasmuch as they did not do so, no argument can be predicated upon the fact of the existence at any time of a restrictive endorsement of the note in question. The mere fact that something was written upon the back of the note by a stranger to it, constituting no part of it, and of no consequence except as an ear-mark of ownership, which, had it remained there, might have led to inquiry as to their rights, is not suffi-

cient to enable the plaintiffs to maintain this action against the defendants (*Commonwealth* v. *Emigrant Industrial Savings Bank*, 98 Mass. 12). But, for the sake of the argument, assuming that the note did bear a restrictive endorsement, then we say :

II. This note, by the law under which it was issued, was made a part of the currency of the country, and is money in the same sense that a bank note is money (13 *U. S. Stat. at Large*, 280).

To *bona fide* holders of this class of paper, the law affords absolute protection against all defects of title, even such as may be detected by the exercise of ordinary diligence in the inspection of the paper ; gross negligence on the part of the purchaser being of no consequence, except in so far as it may afford evidence of *mala fides*. Hence it is necessary that the holder of such a note as the one in question, who intends to restrict its negotiability by a restrictive endorsement, without which the note would continue to be negotiable, must, at his peril, see to it that his intention is so executed that all persons to whom it shall come shall, by an inspection of it, have notice of such intention. The case at bar must not be confounded with that class of cases where an obligation, or the indorsement of an obligation, is simulated or forged, and which, therefore, constitutes no real obligation, and no real endorsement, but a mere false token. Here the obligation is genuine and real, and the claim of the plaintiff rests merely upon a futile attempt to give notice of his title to it, and to control the manner of its performance. If the owner of such an instrument is deprived of his title by a felony, for example, a theft, or by the erasure of a writing in pencil, or of any other writing so done as to render its erasure possible, leaving the instrument in a perfect condition to pass as a valid instrument from hand to hand by delivery, whether such erasure be a felony or fraud, it is either his misfortune or his fault. Public policy imperatively requires that a *bona fide* holder should not be the sufferer (*Gould* v. *Segee*, 5 Duer, 260 ; *Hall* v. *Wilson*, 16 Barb. 548 ; *Wookey* v. *Pole*, 6 O. L. 327 ; *Birdsall* v. *Russell*, 29 N. Y. 220 ; *Belmont Branch Bank* v. *Hodge*, 35 Id. 65 ; *Raffael* v. *The Bank of England*, 17 Com. Bench, 161 ; *Goodman* v. *Hall*,

4 Adol. & Ellis, 870; *Foster* v. *Pierson*, 1 C. M. & R. 849; *Goodman* v. *Simons*, 20 How. U. S.; *Steinhart* v. *Boker*, 34 Barb. 436; *Bank of Bengal* v. *Fagin*, 7 Moore P. C. 72; *Ingraham* v. *Primrose*, 97 C. L. 82; *Young* v. *Grote*, 4 Bing. 253).

III. It is submitted that there is another conclusive answer to this action, although of a radically different character. The action is brought by the Adams Express Company, who were carriers of the note in question, and in possession of it at the time of the robbery, and who have since acquired whatever title the bank had by a payment of the value thereof to the bank. It was doubtless the duty of the express company, at all hazards, to protect the note in question, and to deliver it safely, and to this end to exercise the necessary degree of care and diligence, however great that might be. In recognition of this liability, the company paid to the bank the value of the note. Hence it follows, that the proximate cause of the loss of this note was the failure on the part of the plaintiffs to perform a duty which they owed, and which the law imposed upon them in respect to this note, viz., to protect it from loss by robbery, at all events, and at any expense of care and diligence necessary for this purpose. Having failed to perform this duty, and having lost the note in consequence of that failure, they cannot recover it or its value. A failure to perform a duty, however onerous it may be, is negligence, and every person must bear the consequence of his own negligence, from which no right of action can spring, especially against one who, in case of success, would be made the victim of that negligence. Hence the rule that where one of two innocent persons is to suffer from the fraud of a third, he who has enabled such third person to commit the fraud must bear the loss (*Phillips* v. *Thurn*, Law. Rep. 1 C. P. 472; *Young* v. *Grote*, 13 C. L. 420; *Lickbarrow* v. *Mason*, 2 T. R. 70; *Fatman* v. *Lobach*, 1 Duer, 354; *Bank of Buffalo* v. *Kortwright*, 22 Wend. 348; *Putnam* v. *Sullivan*, 4 Mass. 45; *MacDonald* v. *Muscatine Nat. Bank*, 27 Iowa, 319).

This rule is strikingly illustrated by the case of *Sturge* v. *Starr*, 2 M. Y. & K. 195.

Dinsmore v. Duncan.

*Clarence A. Seward & Charles M. Da Costa*, for plaintiffs.

The primary inquiry is as to the effect of the endorsement by the bank, prior to the delivery of the note to the plaintiff's company for transportation. (1). It was a prudential act ; and the law favors acts of prudence. The bank was about to part with the physical possession of the note, and it undertook to guard itself against loss while the note was *en route* from the bank to the Treasury Department. (2). Such endorsement was proper in itself, and was intended to subserve a useful purpose. (3). It was intended to evidence the individual proprietorship of the bank in the note so endorsed, and thus to prevent the acquisition of title by a stranger. (4). It was expressed in the only language known to the law, by which such proprietorship could be asserted. (5). Such expression was in the precise form which has been sanctioned by the law since credit became negotiable. (6). It reduced the general promise contained in the body of the note, to pay to ———— ———— ————, or bearer, to an individual promise to pay to the bank, and to it alone. (7). It converted the single obligation of the promiser, and with its assent, from a promise to pay in money, into a contract to exchange for bonds ; and such contract could not be legally interpreted as against either one or the other of the parties thereto, without reference to the statute under and by which such contract was authorized. (8). It relinquished the right of the owner to demand payment in money, and substituted therefor his contract to accept, under the statute in lieu of money, further evidences of indebtedness on the part of the Government. (9). It transferred to the United States the property in the note, by making it the payee thereof; and reposed simply upon the statute and the faith of the Government, for the insurance and delivery of the bonds (*United States* v. *Barker*, 1 Paine C. C. R. 156 ; *Dugan* v. *The United States*, 3 Wheat. 172). (10). It transformed the contract from the obligation of the Government to pay, into a mutual contract : (*a*). To issue bonds in payment. (*b*). To receive such bonds as payment. (11). It terminated the contract to pay in money, and therefore, demonetized the instrument, and converted it

into a simple paid up subscription to another and further Government loan (*Rex* v. *Reeves*, 2 Leach C. C. R. 808, 816). Such subscription was not transferable save with the assent of the subscriber. (12.) It converted an individual promise on the part of the Government into a mutual contract, which mutual contract became by the fact of its mutuality, a *chose in action*, not negotiable, and transferable by assignment only; and until such assignment was made, the title to the thing into which the note so endorsed was to be converted, remained in the bank. (13.) If the mutual promise was not negotiable, title therein could not be passed as against the bank, by a forgery. The analogy between the mutual promise created by the endorsement of the note, and the statute which sanctioned its conversion into bonds, and a certificate of stock in a corporate company, is precise and complete. Under a forged transfer of stock, neither the corporation, nor a *bona fide* purchaser for value, can be protected. This was decided in the case of *Davis* v. *The Bank of England* (2 Bing. 393), where the bank was held liable to refund past dividends and the value of the stock which it had permitted to be paid and transferred under a forged power of attorney. The same principle was enunciated also *In re The Bahia and San Francisco Railway Co.* (L. R. 3 Q. B. 584), and in *Johnston* v. *Renton* (L. R. 9 Eq. Cas. 981). It was further affirmed by the House of Lords in the case of *Marsh* v. *Keating* (1 Bing. N. C. 197), which sustained an action in favor of a stockholder whose stock had been sold without his knowledge under a forged power of attorney, for money had and received against the party who held the proceeds of the sale. See also *Taylor* v. *Midland Co.* (28 Beavan, 287). (14.) The note so endorsed became a *chose in action* (*Rex* v. *Capper*, 5 Price, 217); and had no further negotiability save for the purpose of redemption by conversion, and it could not thereafter be considered as money (*Nightingale* v. *Devisme*, 2 Wm. Black. 684); and it thereafter amounted in judgment of law to nothing but a right to receive the bonds. This was further decided in the case of *Wildman* v. *Wildman* (9 Ves. 173), in which the court said, that the circumstance that the Government was the debtor, made no difference; and that

the mere right to receive that which was promised by the Government had no resemblance to chattels movable or to coined money capable of manual apprehension.

By the Court.*—Robinson, J.—This action is brought for the alleged conversion of a seven-thirty note of the United States, issued under the act of Congress of March 3, 1865 (13 U. S. Statutes at Large, 468), which, when held by the First National Bank of New Albany, Indiana, under whom plaintiffs assert title, was substantially in this form :

" $1,000.             Three years after date
The United States promise to pay to the order of                   ,
One thousand dollars, with interest at $7\frac{3}{10}$ per cent., payable semi-annually in lawful money."
                    (Signed by the proper officers of the Treasury.)

It was, on the 22d of May, 1868, entrusted by that bank to plaintiffs (common carriers), for remittance to Washington for conversion into five-twenty bonds, as allowed by that act, being endorsed by the cashier, " Pay to the bearer (printed), Secretary of the Treasury, for conversion. W. Mann, Cash." The package containing this note, in course of transportation, was, on the night of May 22d, 1868, stolen from the plaintiffs and taken to Liverpool, England, where, on the 25th day of June, 1868, the endorsement having been obliterated or extracted by some chemical process, so that it could not be observed, it was, in good faith and for full value, purchased by the firm of L. Bemas & Sons, bankers, who, on the 26th, remitted it to the defendants, bankers, and their correspondents in New York, for conversion. The defendants sent the full value of the note to Bemas & Sons, on July 8, 1868, without notice affecting the validity of their title, and they subsequently converted it by accepting substituted security, in conformity to the provisions of the act of 1865.

The note, although issued by the United States Government, was subject to the common law rule applicable to commercial paper (*Murray* v. *Lardner*, 2 Wall. 118 ; *Thompson* v. *Lee*, 3 Ib. 327 ; *Texas* v. *White*, 7 Ib. 700). As issued, no payee being

* Present, Daly, Ch. J., Robinson, and Larremore, JJ.

named, it was payable to any *bona fide* holder before maturity. The payee's name being in blank, he could insert his own name or that of any other person (*Cruchley* v. *Clarance*, 2 M. & S. 90). But until such restriction was placed upon the negotiability of the instrument, it continued an obligation through the law merchant, payable to any one who, in good faith and before maturity, became its holder. Endorsements or other minutes on its back or otherwise, so long as they continued apparent, operated at most by way of notice or of guaranty, but otherwise in no way interfered with the negotiability of the instrument, which, until its restriction by the insertion of the name of a payee, continued payable to bearer (*Birdsall* v. *Russell*, 29 N. Y. 227). Defendant's title to the note was in no way acquired through any endorsement of the First National Bank of New Albany, and was in no way affected by any obliteration or forgery of the endorsement made by W. Mann, their cashier.

For these reasons judgment should be given in defendants' favor.

Judgment for defendants.